**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
CHRISTIAN P. KLEIN,

                                        Plaintiff,                        <u>**OPINION & ORDER**</u>

                    -against-                                             **23-cv-272**

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.
-----------------------------------------------------------------X
**Jennifer E. Willis, United States Magistrate Judge:**

Plaintiff Christian Klein ("Mr. Klein") brings this action under 42 U.S.C. §
405(g) of the Social Security Act for judicial review of the final decision of the
Commissioner of the Social Security Administration (the "Commissioner"). Mr. Klein
asserts a disability due to musculoskeletal disorders, complications with his hip,
shoulders and left leg, migraines, as well as severe mental health issues. <u>See</u> R.[1] at
319. The Commissioner denied Plaintiff's application for disability insurance benefits
("DIB") under Title II of the Social Security Act ("the Act").

Plaintiff moved for judgement on the pleadings pursuant to Federal Rule of
Civil Procedure 12(c). Dkt. Nos. 15, 16. For the reasons stated below, Plaintiff's
motion is **GRANTED**.

---

[1] Citations to "R." refer to the Social Security Administration ("SSA") Administrative Record (Dkt.
No. 7). Page numbers cited refer to the Record page number, not the ECF page number.

# I. BACKGROUND

## A. Procedural History

On June 9, 2017, Mr. Klein filed an application for Supplemental Security Income ("SSI") and for DIB based on disability as of March 2, 2017. R. at 269, 303. Mr. Klein subsequently amended his alleged disability onset date to November 17, 2014, and this date was the onset date used by the ALJ to conduct her analysis. R. at 305, 629. In determining the disability onset date, the date alleged by the individual should be selected if it is consistent with all available evidence. Monette v. Astrue, 269 F. App'x 109, 112 (2d Cir. 2008). Here, the Court finds November 17, 2014, to be consistent with all available evidence and is therefore the proper onset date.

Mr. Klein's claim was denied on October 13, 2017. Id. On October 26, 2017, Mr. Klein filed a written request for a hearing before an Administrative Law Judge ("ALJ"). Id. This request was granted, and an administrative hearing was held in April 2019 before ALJ Katherine Edgell. R. at 30, 42. In May 2019, ALJ Edgell denied Mr. Klein's claim, finding that he was not disabled under the Act. R. at 42. Mr. Klein then requested review by the Appeals Council, which denied his appeal in July 2020. R. at 1. Mr. Klein appealed that denial to the United States District Court for the Southern District of New York in March 2021 (Case No. 7:21-cv-2470). R. at 681. In January 2022, the Court reversed the Commissioner's decision and remanded this action to the Commissioner (Civil Action Number: 1:21-cv-02470-DCF). R. at 684-686. Per the court's remand, an additional administrative hearing was held in July 2022. R. at 757, 764. In November 2022, ALJ Sharda Singh found that Mr. Klein was

not disabled. R. at 642. Mr. Klein subsequently brought this action seeking review of the 2022 decision of ALJ Singh. Dkt. No. 1.

Mr. Klein subsequently brought this action, contending (i) the ALJ's residual functional capacity ("RFC") determination was not supported by the evidence; (ii) the ALJ misrepresented or disregarded important parts of the medical evidence; (iii) the ALJ erroneously limited him to sedentary work with a sit/stand option in the RFC; and (iv) the ALJ failed to properly assess his ability to perform work activities on a function-by-function basis before deciding he was capable of sedentary work.  Memo. of Law in support of Pl's Motion for Judgment on the Pleadings at 20-28 (Dkt. No. 16) ("Pl. Memo").  Mr. Klein seeks reversal with remand for approval and a calculation of benefits.  Pl. Memo. at 4, 30.

## B.  Personal Background

Mr. Klein was 25 years old on the alleged disability onset date.  R. at 157.  Mr. Klein's highest level of education is high school. R. at 119.  Mr. Klein's past relevant employment includes working as a "short order cook," "warehouse worker," "order picker," and "a general laborer."  R. at 135-138.

## C.  Plaintiff's Relevant Medical History

Mr. Klein asserts a disability that renders him unable to return to work, due to "musculoskeletal disorders and symptoms referable to neck", pain in his right and left shoulders, right hip, and left leg, PTSD, "personality disorder," ADHD, "anxiety," "bipolar disorder," "depression," and "migraines." R. at 319. He sought treatment on

numerous occasions and with different providers for continuing symptoms. His relevant medical history is recounted below.

### a. Psychiatric Medical Evidence

#### i. 2016 Psychiatric Evaluation – Dr. Hussain

Mr. Klein was referred by FEGS WeCare to a specialist, Dr. Fazil Hussain, Medical Director of the Manhattan Clinic, for a psychiatric evaluation in order to determine Mr. Klein's ability to work. R. at 425.

In September 2016, Dr. Hussain conducted the evaluation and determined that Mr. Klein had no sensory, communication, interpersonal, environmental, general, or cognitive limitations, but he did have emotional limitations and thus, required a "low stress" job. R. at 426. Dr. Hussain also determined that Mr. Klein needed work accommodations, including limiting or eliminating lifting, pushing, pull, carrying, stooping, bending, and reaching; and work free from dust, smoke, odors, and fumes. R. at 427.

#### ii. 2016 Work Readiness Evaluation – Dr. Hein

In November 2016, Mr. Klein was referred to Dr. David Hein, a therapist, by FedCap for a work-readiness evaluation. R. at 452. Dr. Hein's preliminary diagnosis of Mr. Klein included bipolar disorder, "current episode hypomanic," ADHD predominantly hyperactive/impulsive, and PTSD. R. at 455. Dr. Hein found that Mr. Klein was "overly alert, imagining bad outcomes of things, nervous about things…endorses irritability, avoidance behaviors, flashbacks, hypervigilance… [had] feelings of guilt, worthlessness, weight disturbance, sleep disturbance." R. at

456. Dr. Hein added that Mr. Klein demonstrated serious signs of "paranoia," "some magical thinking," "pressured speech," "grandiosity," and "tangential thinking." R. at 456.

### iii.   2016 Psychiatric Treatment – Nurse Practitioner ("NP") Gray

Mr. Klein sought psychiatric treatment at Community Counseling & Mediation ("CCM") in December 2016. NP Mary Gray's diagnostic impression of Mr. Klein was "Bipolar II Disorder, current episode hypomanic; cocaine, cannabis & alcohol use disorders, moderate." R. at 555. NP Gray's determination of Mr. Klein's mental status was that he was "well oriented in all spheres;" he seemed alert, his mood was "anxious;" there was an apparent "tangential degree of conceptual disorganization;" and that his thought process was characterized by "magical thinking." R. at 555.

### iv.   2017 Psychiatric Treatment – Dr. Astwood

Mr. Klein also began therapy sessions with psychiatrist Dr. Jesse Astwood at CCM in January 2017. R. at 434. Dr. Astwood diagnosed Mr. Klein with "Bipolar 2 MRE mixed w/ psychotic features, cannabis use disorder, cocaine use disorder (in remission)." R. at 435. Dr. Astwood expressly stated that Mr. Klein "cannot currently function at a job." R. at 434.

In March 2017, Dr. Astwood maintained that Mr. Klein would be unable to work for at least a year due to his "hypomania." R. at 395. At another appointment in April 2017, Dr. Astwood again noted that Mr. Klein's symptoms were consistent with "hypomania with some psychotic features." R. at 437.

In May 2017, Dr. Astwood noted that Mr. Klein maintained a diagnosis of "Bipolar 2 MRE mixed w[ith] psychotic features, cannabis use disorder," and "cocaine use disorder (in remission)." R. at 439. Dr. Astwood also saw a huge improvement in Mr. Klein's engagement in care—he was consistent with both prescribed medication and with therapy appointments. Id. Mr. Klein showed no signs of paranoia at that time, but he was exhibiting depressive symptoms, particularly "some hopelessness," and this become more apparent as his hypomania decreased. R. at 438. Dr. Astwood's June 2017 report added that Mr. Klein experienced heightened difficulty with attention and focus, for which he requested medication. R. at 441. Dr. Astwood agreed to begin a trial of Wellbutrin "to better target inattention and poor focus." Id. Dr. Astwood also noted that Mr. Klein had recently started "talk therapy." Id.

### v.   2018 Psychiatric Treatment -- Dr. Renshon

Still receiving psychiatric treatment at CCM, Mr. Klein had a therapy session with psychiatrist Dr. David Renshon in January 2018. Dr. Renshon reported that Mr. Klein was "moderately hypomanic" at their appointment, but "no paranoia elicited." R. at 575. Dr. Renshon noted depressive symptoms were still present at that time. R. at 576.

### vi.   2018 Psychiatric Treatment -- Dr. McCarthy

In an initial intake assessment by Dr. Christopher McCarthy on March 12, 2018, Mr. Klein presented as "well oriented in all spheres;" his mood was "euthymic;" his speech was "logical, coherent, and goal-directed;" and there was a "negligible degree of conceptual disorganization" manifest. R. at 587. Dr. McCarthy diagnosed

Mr. Klein with bipolar disorder, PTSD, ADHD, and alcohol use disorder. R. at 588-589.

### vii.   2018 Psychiatric Treatment -- Dr. Horvath

In March 2018, NP David Horvath reported that Mr. Klein's speech was "characterized by loosening associations" as he had "unrealistic" ideations about becoming an actor by 'studying' movies at home watching TV; his attitude was also "hostile and uncooperative." R. at 595. However, in an appointment in April 2018, Mr. Klein was "doing much better" and seemed happier and more focused. R. at 598. During this appointment, NP Horvath increased the dosage of Mr. Klein's prescriptions in April 2018. R. at 599.

### viii.   2018 Incident at CCM

In September 2018, Mr. Klein was discharged from Community Counseling and Mediation, following an incident in which he became "hostile" to the clinic's on-staff psychiatric nurse practitioner. R. at 617.

### ix.   2018 Suicide Attempt

In a 2020 initial psychiatric evaluation report by Dr. Bashayan, a psychiatrist at New York Presbyterian Hospital, he noted that Mr. Klein had "one prior suicide attempt," but "self aborted" in November 2018. R. at 836.

### x.   2019 Emergency Room Incident at Columbia Presbyterian Hospital

In July 2019, EMS brought Mr. Klein to Columbia Presbyterian Hospital's emergency room Mr. Klein was "restrained by multiple NYPD officers" on the

sidewalk because he was "acting aggressive and violent on the sidewalk in front of the precinct." R. at 847. The psychiatric evaluation described Mr. Klein as "agitated" upon arrival at the ER. R. at 837, 847. Mr. Klein spoke to the treating physician about his inability to sleep, racing thoughts, and depression. R. at 847. The mental status exam noted that Mr. Klein was calm, linear, and coherent; had a disheveled and wild appearance; inadequate general appearance; adequate hygiene; inappropriate grooming; good attention; cooperative attitude; normal speech and activity; and fair insight, judgment, and impulse control. R. at 849-850. The diagnosis reported: acute problems; alcohol abuse with intoxication; restlessness and agitation; chronic problems; migraine; attention deficit disorder; and bipolar disorder. R. at 850.

### xi. 2020 Emergency Room Incident at New York Presbyterian Hospital

In March 2020, Mr. Klein was brought to the emergency room of New York Presbyterian Hospital after calling 911 and stating he had been "shot at." R. at 836. Mr. Klein's chief complaint upon arrival was "somnolen[ce]" (intense drowsiness). Id. Mr. Klein was then handcuffed and EMS reported that Mr. Klein had been "aggressive, confrontational, and uncooperative on scene with erratic behavior." R. at 837. The EMS Report stated: "Pt needing re-directly (sic) was loud, using racial slurs, uncooperative, threatening to sue, using foul language, only wanting to answer certain questions." Id. The report also noted that Mr. Klein was "presenting with a psychiatric problem, such as depression, anxiety, psychosis, substance abuse, suicidal ideation, and/or self-injuring behavior." Id. Mr. Klein "did not respond to redirection"

8

so he received "Midazolam" and "Haldol." Id.  Mr. Klein did not "meet the criteria for inpatient hospitalization" and was discharged. R. at 841. The discharge diagnosis was "altered mental status, unspecified altered mental status type," and "alcoholic intoxication with complication." Id.

### xii.  Psychiatric Progress Notes 2018 through 2022 – Dr. Tutnauer

The Record includes 13 pages of psychiatric progress notes from Family Services of Westchester, Inc. ("Family Services") by treating psychiatrist Dr. Steven Tutnauer, which cover the period of December 17, 2018 to June 15, 2022. R. at 859-871. These records noted a brief incarceration in February 2020 for car theft and violating an order of restraint. R. at 864. From 2020 through 2022, Dr. Tutnauer intermittently noted that Mr. Klein was "working at moving company," but also stated that Mr. Klein "reports pain-needs orthopedist. R. at 864-859. In September 2021, Dr. Tutnauer stated that Mr. Klein was "struggling with work" but could "study, and complete house chores." R. at 861. Mr. Klein also reported needing "surgery for hip, wrist, shoulder, and toe" in 2022. R. at 859.

The progress notes also mention that Mr. Klein was at some point charged with assaulting his mother and shuffled between living with his mother and living in a shelter. R. at 859-869. The notes further mention that Mr. Klein was "[o]n public assistance—cash assistance and food stamps" as early as May 2019. R. at 869.

### b.  Physical Medical Evidence

#### i.  2015 Treatment at Family Medical Centers – Dr. Yuen

In March 2015, Mr. Klein had a medical appointment with Family Medical Centers where he was treated by Dr. Thomas Yuen, a family practice physician. R. 393. Dr. Yuen stated that Mr. Klein was not able to work at that time because he was experiencing "pains and spasms." R. at 393.

#### ii.  2016 Physical Assessment and Work Readiness Assessment – Dr. Hussain

In September 2016, Dr. Hussain, in a physical assessment, noted that Mr. Klein experienced "sharp" and "severe" pain in his neck, right shoulder, right hip, and left knee. R. at 425. Dr. Hussain also determined Mr. Klein's work limitations in a work-readiness assessment—Mr. Klein was only able to lift items of about 10-15 pounds for less than an hour, about 1-10 times within the hour; Mr. Klein was only able to stand and walk for about 1-2 hours; was only able to push items of about 10-15 pounds for less than an hour, about 1-10 times within the hour; was able to sit; was not able to reach, kneel, squat, or repeatedly bend; but was able to exhibit manipulative skills (such as grasping, releasing, handling objects). R. at 425-426. Dr. Hussain also found that Mr. Klein did have respiratory limitations. R. at 426-427. Dr. Hussain concluded, regarding work accommodations, that Mr. Klein should "limit/eliminate lifting, pushing, pulling, carrying, stooping, bending, reaching" and he should "eliminate dust, smoke, odor, and fumes" from his work environment. R. at 427.

10

### iii.  2016 MRI at Montefiore Medical Center ("MMC")

In October 2016, Mr. Klein had an MRI done at MMC. R. at 541. The MRI revealed a trace popliteal cyst in Mr. Klein's left knee. Id.

### iv.  2017 Treatment by Dr. Mitelman after Train Derailment Accident

On May 30, 2017, Mr. Klein was evaluated by Dr. Raisa Mitelman, an internal medicine and family care physician at Allay Medical Care. R. at 519. Mr. Klein stated that he was involved in a train derailment accident on May 18th where he struck his head on a window. Id. Dr. Mitelman determined that Mr. Klein had a "shoulder sprain," a possible head concussion, lower back pain, and "positive impingement signs" in his left shoulder. Id. Dr. Mitelman saw Mr. Klein again in June 2017, and assessed that Mr. Klein still had a "strained neck" as a result of the train encounter. R. at 520.

### v.  2017 Head Injury Treatment at New York Presbyterian Hospital

In September 2017, Mr. Klein was evaluated by New York Presbyterian for head injuries resulting from the train accident. R. at 475. The treatment notes demonstrate that Mr. Klein had been suffering from headaches and "positional neck pain" at least since the date of the accident and that Mr. Klein appeared to still be suffering from "post-concussive headaches." R. at 475, 477. The treatment notes state that his "headaches last 20 minutes to [the] entire day." R. at 475. The treating physician noted that it was "atypical" for the post-concussive headaches to have "lasted this long after the accident." R. at 477.

### vi.   2017 Shoulder Treatment -- Dr. Fluk

In November 2017, Dr. Beata Fluk diagnosed Mr. Klein with a "shoulder contusion." R. at 523. Dr. Fluk also noted Mr. Klein had "limited ROM [range of motion] due to pain [and] tenderness to palpation." Id.

### vii.   2018 Shoulder Treatment -- Dr. Mitelman

In April 2018, Dr. Mitelman issued a diagnosis of "shoulder tendinitis," "cervical radiculopathy," "hip sprains," "left knee injury," "migraines" and "chronic fatigue." R. at 526.

### viii.   2020 Shoulder/Hip Treatment -- Dr. Gott

In January 2020, treating orthopedist Dr. Michael Gott evaluated Mr. Klein after complaints of right shoulder and right hip pain. R. 814. Dr. Gott found that the right shoulder revealed "type II acromion and no significant arthritis." R. at 816. The diagnosis included: "right shoulder pain likely SLAP tear," and "right hip pain femoral acetabular impingement." R. at 817.

Dr. Gott then treated Mr. Klein in May 2020. R. at 820-24. The examination showed pain and a limited range of motion in the right hip. Dr. Gott also evaluated Mr. Klein for right shoulder injuries. Examination of the right shoulder showed: "slightly limited" range of motion "with mild to moderate discomfort at the extreme;" "positive impingement;" "slight discomfort noted with Hawkins maneuver;" decreased "rotator cuff strength;" and decreased "supraspinatus strength" with "mild discomfort." R. at 828. The diagnosis was "right shoulder impingement with

continued discomfort despite conservative treatment." Id. Dr. Gott administered a "Depo-Medrol" and "Marcaine" injection to the "subacromial space." R. at 829.

### ix.  2022 Physical Examination – Dr. Leali

Examination and testing were then conducted by Dr. Alejandro Leali in January 2022. Dr. Leali noted that Mr. Klein "walks with a slight hip limp on the right." R. at 919. Dr. Leali's examination of his right hip revealed "a positive Stinchfield with pain in the groin and palpatory tenderness over the rectus. Equivocal FADIR and a positive Faber." Id. The "primary encounter diagnosis" was "right hip impingement syndrome" and a "tear of [the] right acetabular labrum." R. at 920. Further testing was advised. Id.

### x.  2022 MRI of Right Hip

An MRI of the right hip conducted on March 9, 2022, showed "progressive anterior right hip pain" with "impingement." R. at 953. Specifically, there were "features of cam type femoral acetabular impingement." Id. There was "cam morphology involving the femoral head neck junction." R. at 954. The MRI revealed a "small split at the base of the anterior labrum" and "mild iliopsoas bursitis." Id.

### xi.  2022 MRI of Right Wrist

An MRI of Mr. Klein's right wrist conducted on March 16, 2022 showed a "tear of the volar fibers of the scapholunate ligament, preferentially involving the lunate attachment." R. at 1007. The "extensor carpi ulnaris" was "dislocated ulnarly from the ulnar groove, with likely tearing of the subsheath." R. at 1008.

### xii. Treatment Records from the Hospital for Special Surgery 2021 − 2022

There are office treatment records from the Hospital for Special Surgery covering December 2021 to July 2022. R. at 880-1308. These records reveal that Mr. Klein "received corticosteroid injection at least once previously in 2020." R. at 884. A progress note from December 2021 mentioned that Mr. Klein "works as a mover" and "has had increased pain since then." Id. Also in December 2021, an x-ray of his right shoulder demonstrated "hypertrophic changes to the AC joint." R. at 891.

 In March 2022, Mr. Klein continued to experience pain in his wrist and hip when he acted as a mover; he felt a ""snapping" with certain lifting positions." R. at 1061. Records show that Mr. Klein had "ECU subluxation." Id.

In July 2022, these records diagnose Mr. Klein with "ECU tear and instability with pain and dysfunction." R. at 1157. During this month, Mr. Klein underwent a surgical procedure to address his wrist issues and repair the tendon tear. R. at 1082, 1157-1158.

### c. Opinion Evidence

The Court notes that the opinion evidence touch on both physical and mental medical evaluations.

### i. Dr. Rozelman

In October 2017, Dr. Helen Rozelman, a state agency psychiatric consultant, conducted a consultative examination on Mr. Klein to determine his disability. R. at 147-154.

14

Reviewing the medical evidence, Dr. Rozelman characterized the x-rays of Mr. Klein's right hip and shoulder as "unremarkable." R. at 147. She stated that the "physical exam shows the claimant walks with an antalgic gait to the right." <u>Id.</u> Dr. Rozelman also noted that Mr. Klein's squat was "full" and he "does not use an assistive device for ambulation." <u>Id.</u>

Under Dr. Rozelman's psychiatric review, she found that Mr. Klein had the following impairments: "Depressive, Bipolar and Related Disorders," "Neurodevelopmental Disorders," "Substance Addiction Disorders (Alcohol)," and "Substance Addiction Disorders (Drugs)." R. at 148. However, she did not find that these medically determinable impairments "precisely satisfied the diagnostic criteria" of mental disorders recognized under the law. <u>Id.</u> Dr. Rozelman further noted, "Abusing substances does show poor judgment /poor decision making and possibly inability to cope adequately with stress; current treatment does not support severity of allegations, capable of simple work, make simple decisions." R. at 149.

While assessing Mr. Klein's physical RFC, Dr. Rozelman determined that he had "no exertional (lifting, carrying, walking, standing, sitting, pushing, or pulling) or non-exertional (postural, manipulative, visual, communicative, or environmental) limitations. R. at 150, 163.

Assessing Mr. Klein's mental RFC, Dr. Rozelman determined Mr. Klein had "understanding and memory limitations" but was "[n]ot significantly limited." R. at 164. She also found that Mr. Klein had "sustained concentration and persistence

15

limitations" but was "[n]ot significantly limited" in his ability to "carry out very short and simple instructions," "carry out detailed instructions," "maintain attention and concentration for extended periods," "sustain an ordinary routine without special supervision, and make simple work-related decisions." R. at 164-165. However, Dr. Rozelman did find that Mr. Klein was "[m]oderately limited" in his ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "work in coordination with or in proximity to others without being distracted by them," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R at 165.

Dr. Rozelman also determined that Mr. Klein had "social interaction limitations," but he was "[n]ot significantly limited" in his ability to "interact appropriately with the general public, ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from supervisors," and "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." Id. She did find him to be "[m]oderately limited" in his ability to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Id. Finally, Dr. Rozelman determined that Mr. Klein had adaptation limitations such as being "[m]oderately limited" to "respond appropriately to changes in the work setting," and to "set realistic goals or make plans independently of

16

others," but was "[n]ot significantly limited" in his ability to travel in unfamiliar places or use public transportation. R. at 165-66.

To conclude, Dr. Rozelman determined that Mr. Klein was "[n]ot disabled" and was "limited to unskilled work because of the impairments." R. at 167.

### ii.  Dr. Antiaris

In September 2017, psychiatrist Dr. Melissa Antiaris conducted a consultive examination of Mr. Klein for the New York State Office of Temporary & Disability Assistance. R. at 463-64. Dr. Antiaris determined that Mr. Klein had "no limitations" in his "ability to understand, remember, and apply simple directions and instructions or complex directions and instructions." R. at 462. Dr. Antiaris also found that Mr. Klein was "moderately limited in his ability to use reason and judgment to make complex work related decisions"; and "markedly limited in his ability to interact adequately with supervisors, co-workers, and the public…regulate emotions, control behavior, and maintain well-being. Id. She noted that the results of her examination "appear to be consistent with psychiatric concerns which may significantly interfere with" Mr. Klein's "ability to function on a daily basis." Id.

### iii.  Dr. Pelczar-Wissner

Also in September 2017, Dr. Catherine Pelczar-Wissner, an internal medicine physician, conducted a consultative examination of Mr. Klein for the New York State Disability Office. R. at 466-69. Dr. Pelczar-Wissner determined Mr. Klein's gait was "mildly antalgic on the right," he had "difficulty walking on heels and toes because of the right leg," and he "needed no help changing for exam or getting on and off exam

17

table." R. at 467. Additionally, she noted that Mr. Klein "felt pain in the right hip," but an x-ray of that hip was "negative." R. at 468. Dr. Pelczar-Wissner found that Mr. Klein had a "marked restriction" for squatting, bending, and heavy lifting and carrying. R. at 469. Dr. Pelczar-Wissner diagnosed Mr. Klein with "internal derangement, right hip," "baker cysts, left knee," "history of mild concussion," ADHD, anxiety, "bipolar," "personality disorder" and headaches. Id.

### iv.   Dr. Consentino

In July 2022, Dr. Frank Consentino, examining physician at the Family Services of Westchester, determined that Mr. Klein had a "poor" ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; maintain attention/concentration; understand, remember, and carry out simple, detailed but not complex, and complex instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability; and he had "fair" ability to maintain personal appearance and function independently. R. at 872. Dr. Consentino noted that the "above limitations have been present since October 2018." R. at 873.

### v.   Dr. Tutnauer

In July 2022, Dr. Steve Tutnauer, examining psychiatrist, determined in his evaluation of Mr. Klein that he had a "fair" ability to follow work rules; use judgment; function independently; understand, remember, and carry out simple or detailed but not complex instructions; maintain personal appearance; and demonstrate reliability. R. at 874-75. Dr. Tutnauer also determined Mr. Klein had "poor" or no ability to relate

to co-workers; deal with the public; interact with supervisors; deal with work stresses; maintain attention/concentration; understand, remember, and carry out complex instructions; behave in an emotionally stable manner; and demonstrate reliability. Id. Dr. Tutnauer noted that the "above limitations have been present since long term." R. at 875.

## D. The 2022 Hearing

### a. Plaintiff's testimony

On July 18, 2022, Mr. Klein appeared and testified at a hearing via teleconference before ALJ Sharda Singh. R. at 651. Warren Maxim testified as a VE. Id.

Mr. Klein was 32 years old at the time of the hearing. R. at 658. His highest level of education was still high school. R. at 656.

Mr. Klein testified that he was currently homeless and had been homeless "off and on since 2019." R. at 655. He said he stayed between Yonkers and the Bronx while other nights he rode trains. Id. He said he tried to "move back home" around the time of the last hearing, which was in 2019, but it did not work out. Id.

Mr. Klein testified that he could not maintain employment for more than a month or two due to his difficulty interacting with people. R. at 656. He admitted that he did not trust people, and he gets social anxiety: "people aren't tolerable towards people like me." R. at 657. He said he saw a psychiatrist and therapist for mental health treatment; and regularly saw three to four doctors on rotation. R. at 659, 661. His prescribed medications were "Adderall," "Strattera (100 mg)," "Lexapro (10 mg)"

19

and "Seroquel" as an anti-psychotic and for depression. R. at 662. He said despite the medication, he is "still a screw up." Id.

For physical reasons, he expressed that he needed four surgeries; one was just done on his right wrist and required 6 months to recover; he was getting hip surgery next and would need "a year more recovery." R. at 657. He testified that his "shoulder has missing cartilage," but his right shoulder was being treated at that time. Id. He also said he had a "permanent" bunion on his toe that needed to be treated. Id. He stated that he had been prescribed "diclofenac sodium like topical rub for the [hip] pain," but he was still "in pain every day, limping." R. at 659.

Mr. Klein spoke about experiencing difficulty sitting because of pain in his hip. R. at 664. Specifically, when asked if his hip caused him to have trouble sitting, he responded affirmatively. Id. When asked "how long can you sit at one time before you have to change positions," Mr. Klein replied, "It could [be] five minutes or it could be an hour…If I'm on a subway car all night[,] my hip is on fire the whole day, so there's no measurement of time, it's in pain no matter what." R. 664-65. When asked what position does he change to, Mr. Klein expressed that he would "have to extend my leg and like sink my hips where my body's almost like laying down almost." R. at 665. He explained further that he would "have to sit like that for a few minutes without a doubt." Id.

Mr. Klein stated he has difficulty standing. Id. The longest he could stand for was "between 10 and 20 minutes." Id. He stated he "walk[s] with a limp;" could walk

"ten short city blocks" before having to stop; and needed to rest "ten, twenty minutes" before walking again. R. at 666. He said he had just lost his cane and had tried to walk without one, that he was "trying to do my best but it hurts, you know." R. at 666-67. He said he "walked from Penn Station to Time Square" and "was already like in pain, needing to sit down by those chairs," only after walking eight blocks (around 15-20 minutes but "maybe more"). R. at 672.

Regarding Mr. Klein's ability to lift things, he said he had no trouble lifting things with his left hand "at the moment," but "to a certain weight." R. at 667. His left arm could lift "a bag of groceries," "a gallon of milk," and "a dish," but "[i]t would be hard". R. at 667-68. However, he said he could not use his right arm or hand "at all." R. at 668. He could not lift "a gallon of milk" or "put a dish in the cabinet;" had "trouble" dressing himself but did it out of necessity; experienced difficulty tying his shoes; and had trouble taking a shower. Id.

Mr. Klein expressed that he had difficulty with memory and trouble with concentrating on things. R. at 668-69. He explained that he was "terrible with names" and his "everyday tasks have suffered." R. at 669. He described himself as someone who was "not punctual" and "not an organized person." Id. He said he would "get distracted" when reading and his "mind will drift somewhere if I'm reading" such that he would "totally forget" he had an article right in front of him. R. at 670.

21

### b. VE Testimony

The ALJ posed her first hypothetical, asking the VE to assume a hypothetical person of Mr. Klein's "age, education, and past work experience." R. at 675. The ALJ asked the VE to assume this person was limited to "a light exertional level" with the following additional limitations: "a sit-stand option after 20 minutes, having to sit down for one to two minutes and then stand back up, not being off-task"; "can never climb ladders, ropes, or scaffolds"; "occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl"; "[i]s to avoid hazards such as moving machinery"; "[is] further limited to understanding, remembering, and carrying out simple work"; "[is] limited to occasional contact with supervisors, coworkers, and the general public, and is further limited to low stress jobs," which was defined as jobs requiring "occasional judgment, decision-making, and changes in routine workplace setting." Id. The ALJ then asked the VE if that person would be able to perform any past work similar to Mr. Klein's previous work. R. at 675-676. The VE stated that all past work was excluded by the ALJ's hypothetical. R. at 676. The ALJ then asked the VE if there were any other jobs in the national economy that such a person could perform. Id. The VE asserted that he "would need to look at sedentary because you've got sit-stand on a regular basis and frequently and that really does not fit with full-time light work." Id.

The ALJ then asked the VE a second hypothetical, changing the hypothetical from light work to sedentary work, but "all the limitations remaining the same." Id.

The VE responded, "No past work." Id. However, the VE did identify possible sedentary jobs that such an individual could perform: "document preparer," "surveillance system monitor," and "dowel inspector." R. at 677.

In the next hypothetical, the ALJ asked the VE if there were any past jobs or any jobs in general that a person who "would be off-task for more than 15% of a workday" could do. Id. The VE responded in the negative, asserting that such a limitation "would be significantly off task" and "would not allow for any successful full-time work." Id.

## E. The 2022 Decision of ALJ Singh

ALJ Sharda Singh issued her decision on November 2, 2022, denying Mr. Klein's claims. R. at 642. At step one, the ALJ found that Mr. Klein had not engaged in SGA since November 17, 2014. R. at 629.

At step two, the ALJ found that Mr. Klein suffered from the following "severe" impairments: "right hip impingement syndrome, Baker's cyst of the left knee, history of right wrist injury, bipolar disorder, depression, post-traumatic stress disorder, anxiety, and attention deficit hyperactivity disorder (ADHD). Id. The ALJ also found that Mr. Klein had migraines, a "non-severe" impairment. Id.

At step three, the ALJ found that Mr. Klein did not have an impairment or combination of impairments that met or medically equaled the severity of one the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Id.; 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, Refs & Annos. The ALJ determined that Mr. Klein had the RFC to perform "sedentary work" except "an allowance for a sit/stand option after

23

20 minutes, having to stand up 1-2 min[utes]." R. at 632.  The ALJ also determined that he could "never climb ladders, ropes and scaffolds; could occasionally climb ramps, and stairs; could balance, stoop, kneel, crouch and crawl, and occasionally climb ramps, and stairs, balance, stoop, kneel, crouch and crawl"; should "avoid hazards such as moving machinery"; was "limited to understanding, remembering, and carrying simple unskilled work with occasional contact with supervisors, coworkers, and general public and in a low stress environment defined as occasional decision making, judgment, and changes in routine workplace setting." R. at 632.

At step four, the ALJ found that Mr. Klein could not perform any past work. R. at 640.  The ALJ also determined that the "transferability of job skills" was not "material to the determination of disability" because "using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills." R. at 641.

At step five, the ALJ concluded that given Mr. Klein's age, education, work experience, and RFC, there were jobs that existed in "significant" numbers in the national economy that he could perform.  Id.  Examples of these jobs included "document preparer," "surveillance system monitor," and "dowel inspector." R. at 641-42.

In making these determinations, the ALJ considered the persuasiveness of various medical experts. First, the ALJ noted that Dr. Hussain's opinion that Mr. Klein was only "able to perform low-stress work" was "not persuasive since his own examination

showed normal neurological functioning, normal muscle strength." R. at 635. The ALJ also found claimant's psychiatrist Dr. Jesse Astwood to be unpersuasive because "Dr. Astwood [did] not provide a specific function-by-function work assessment" and his assessment was only related to Mr. Klein's functioning in 2017. R. at 636. Next, the ALJ noted that consultative examiner Dr. Antiaris was only partially persuasive because "the marked limitations [were] not supported by any clinical examination findings," but "seem[ed] based only on the claimant's statements." R. at 637. The ALJ also found the mental assessment of Dr. Cosentino unpersuasive because it was "inconsistent with treatment records." R. at 639. The ALJ stated that Dr. Tutnauer's "assessment of poor/none abilities is unpersuasive and inconsistent with his own examinations of the claimant which repeatedly advised that the claimant can study, do house chores. and work for a moving company." Id. The ALJ also found that Mr. Klein's testimony about "the intensity, persistence and limiting effects of these symptoms… to be inconsistent with the objective evidence in the case record." R. at 634. The ALJ noted that this "render[ed] the claimant's allegations less persuasive." Id.

However, the ALJ found State agency psychiatric consultant Dr. Rozelman to be persuasive because his assessment limiting Mr. Klein to low-stress work was "consistent with the claimant's own testimony and mental health records." R. at 640.

For these reasons, the ALJ concluded that Mr. Klein was not disabled as defined in the Act. R. at 642.

## II. LEGAL STANDARD

### A. Standard of Review

In reviewing a final decision of the SSA, "[t]he district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by substantial evidence." Intonato v. Colvin, No. 13-CV-3426 (JLC), 2014 WL 3893288, at *6 (S.D.N.Y. Aug. 7, 2014)(citing Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004)). The reviewing court defers to the Commissioner's factual findings, which are considered conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g).

"Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Lamay v. Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). If a reviewing court finds that there is substantial evidence supporting the Commissioner's decision, it must be upheld. See Perez v. Chater, 77 F.3d 41,46 (2d Cir. 1996).

"On the basis of this review, the court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of

the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" <u>Intonato v. Colvin</u>, 2014 WL 3893288, at *6 (quoting 42 U.S.C. § 405(g)). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear, remand is warranted "for further development of the evidence" or for an explanation of the ALJ's reasoning. <u>Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996) (internal quotations omitted). Additionally, an ALJ's "[f]ailure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." <u>Kohler v. Astrue</u>, 546 F. 3d 260, 265 (2d Cir. 2008) (internal citations omitted).

## B.  Five-Step Sequential Evaluation Process

Under the Social Security Act, a claimant is disabled if they lack the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." <u>Id.</u> at § 423(d)(2)(A).

A claimant's eligibility for disability benefits is evaluated pursuant to a five-step sequential analysis:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.
   See Rolon v. Commissioner of Soc. Sec., 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014) (citing Shaw v. Chater, 221 F.3d 126, 132 (2d Cir.2000)); see also 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

The claimant bears the burden of proof as to the first four steps; the burden shifts to the Commissioner at step five. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003). At step five, the Commissioner determines whether claimant can perform work that exists in significant numbers in the national economy. See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

### III. DISCUSSION

Mr. Klein argues that the ALJ's decision should be reversed because the ALJ's RFC was "not supported by the evidence."[2]  Pl. Memo. at 20.  Plaintiff relies on four

---

[2] The ALJ decision referred to in this section is the 2022 of ALJ Sharda Singh—the most recent ALJ decision. R. at 626-42.

pointed arguments to support this claim.  First, Mr. Klein argues that the ALJ erroneously examined the opinion evidence.  Id. Relatedly, Mr. Klein contends that the ALJ misstated or ignored crucial aspects of the medical evidence. Pl. Memo. at 25. Third, Mr. Klein maintains that the ALJ erroneously limited him to sedentary work with a sit/stand option in the RFC since unskilled work "disallow[s] a sit/stand option pursuant to the Rulings at SSR 83-10" and "alternating between sitting and standing may not be within the concept of sedentary work." Pl. Memo. at 27. Lastly, Mr. Klein asserts that the ALJ failed to properly assess work activities on a function-by-function basis before determining that he is capable of performing sedentary work. Pl. Memo. at 28.

For these reasons, Mr. Klein argues that the ALJ's RFC determination is erroneous, and should be reversed and remanded.  Pl. Memo. at 4, 30.

## A. Whether the ALJ Erroneously Evaluated the Opinion Evidence

In support of Mr. Klein's main argument, Mr. Klein alleges that the ALJ erroneously evaluated the opinion evidence.  Pl. Memo. at 20. He contends further that the ALJ improperly relied on Dr. Rozelman's opinion because Dr. Rozelman only reviewed a "few" medical records that were available to him in October 2017, but not all of the medical records. Pl. Memo. at 22. According to Mr. Klein, Dr. Rozelman did not have any of the following important records at the time he delivered his opinion: records from Dr. Raisa Mitelman, M.D, Dr. David Renshon, M.D., Dr. Steven Tutnauer, M.D., Dr. Frank Consentino (treating mental health specialist), Dr. Fazil Hussain, Columbia Presbyterian Hospital, and the Hospital for Special Surgery. Id.

Additionally, Mr. Klein challenges the strength of Dr. Rozelman's opinion, claiming Dr. Rozelman, "makes no actual reference to any of Mr. Klein's medical records or treatment notes" which served as the basis of the ALJ's opinion. Pl. Memo. at 23.

Mr. Klein also takes issue with the ALJ's declaration that the "multiple assessments, by different treating medical professionals, who all came to the same conclusions," were unpersuasive. Id. Citing the medical professional opinions of Drs. Tutnauer and Antiaris, Mr. Klein argues that the ALJ's RFC determination contradicts their "extensive" psychological and psychiatric medical opinions. Pl. Memo. at 24. Lastly, regarding the exertional restrictions, he contends that the ALJ "partially relied" on Dr. Catherine Pelczar-Wissner's medical opinion from September 2017, yet the ALJ's conclusion "stands in direct conflict" with the expert's findings. Pl. Memo. at 24-25.

In response, Defendant argues that the ALJ correctly evaluated the medical opinions in the record before concluding that Mr. Klein was able to perform a very limited range of sedentary work. Memo of Law in Support of Comm'r's Cross-Mot. for Judgment on the Pleadings and in Opp. of Pl's. Mot. for Judgment on the Pleadings at 11 (Dkt. No. 17) ("Opp."). Defendant asserts that remand is not required since "any error here was harmless." Opp. at 14. Defendant further contends that the ALJ "properly" determined that Dr. Rozelman's opinion was persuasive under the Act since it was "consistent" with the record and with Dr. Antiaris' medical opinion. Opp. at 11-12. As for the exertional limitation of sedentary work, Defendant argues that

"the ALJ properly considered the record as a whole," and that the ALJ only found Dr. Pelczar-Wissner's opinion "somewhat persuasive" but not fully persuasive because she did not define what she meant by "marked" restriction regarding Mr. Klein's ability to squat, bend, and lift/carry heavy things. Opp. at 13. Relatedly, Defendant maintains that the ALJ did not find Dr. Hussain's medical opinion persuasive as it "was not supported by his own findings" and it was "inconsistent with the Dr. Pelczar-Wissner's examination findings." Opp. at 14. The ALJ also didn't find Dr. Consentino and Dr. Tutnauer's medical opinions persuasive for similar reasons. Opp. at 15. Lastly, Defendant makes plain that the ALJ's determination does not need to "perfectly correspond with any of the opinions of medical sources cited in his decision." Opp. at 16.

"Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." Santillo v. Colvin, No. 13-civ-8874, 2015 WL 1809101, at *9 (S.D.N.Y. Apr. 20, 2015) (internal quotations omitted). However, in this case, the ALJ did not make an RFC determination absent supporting medical opinion. The ALJ primarily relied on Dr. Rozelman's opinion, and partially relied on Dr. Pelczar-Wissner, and Dr. Antiaris' opinion. Opp. at 2, 8. Therefore, the ALJ did not improperly substitute her own opinion for that of a physician.

For claims filed on or after March 27, 2017, "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." See § 416.920c(a). "Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." Pena ex rel. E.R. v. Astrue, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d) (2020)) (internal quotation marks omitted). The ALJ no longer gives "specific evidentiary weight to medical opinions," but rather considers all medical opinions and "evaluate[s] their persuasiveness" based on supportability, consistency, relationship with the claimant, specialization, and other factors. See 20 C.F.R. § 404.1520c (a), (b)(2). The ALJ is required to "articulate how [he or she] considered the medical opinions" and state "how persuasive" he or she finds each opinion, with a specific explanation provided as to the consistency and supportability factors. See 20 C.F.R. § 404.1520c (b)(2); Navedo v. Kijakazi, 616 F. Supp. 3d 332 (S.D.N.Y. 2022). But the "most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability...and consistency." See § 416.920c(a).

Consistency is "the extent to which an opinion or finding is consistent with evidence from other medical sources and non-medical sources." Dany Z. v. Saul, 531 F. Supp. 3d 871, 882 (D. Vt. 2021)(citing 20 C.F.R. § 416.920c(c)(2)). The "more

consistent a medical opinion" is with "evidence from other medical sources and nonmedical sources," the "more persuasive the medical opinion" will be. See 20 C.F.R. § 404.1520(c)(2).

Supportability is "the extent to which an opinion or finding is supported by relevant objective medical evidence and the medical source's supporting explanations." Dany Z., 531 F. Supp. 3d at 881. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520 (c)(1), 416.920c(c)(1).

Under this standard, the Court finds that Mr. Klein's argument that the ALJ erroneously evaluated the opinion evidence has merit. The only medical opinion the ALJ found fully persuasive was Dr. Rozelman's opinion, while finding the opinions of Drs. Tutnauer, Consentino, Antiaris, Pelczar-Wissner, and Hussain either unpersuasive or not fully persuasive. The Court disagrees.

First, the Court does not agree with the ALJ's assessment that "Dr. Hussain's provided limits are not substantiated by his own examination." R. at 635. After noting that Mr. Klein had "mild tenderness to motion at posterior cervical spine; mild tenderness to motion at right shoulder joint, mild tenderness to motion at right hip joints," Dr. Hussain concluded that Mr. Klein was only able to lift items of about 10-15 pounds for less than an hour, about 1-10 times within the hour and would need to

"[l]imit/eliminate lifting, pushing, pulling, carrying, stooping, bending, reaching". R. at 424-27. While Dr. Hussain did state that Mr. Klien was "able to walk for 10 blocks" and "use[d] no assistive device," R. at 402-03, this does not directly conflict with his conclusion that Mr. Klein would be able to walk or stand at work for 1-2 hours. R. at 425. Thus, the Court finds Dr. Hussain's conclusions were supported by the medical evidence he gathered during his examination of Mr. Klein.

Moreover, the Court is persuaded by mental health counselor Consentino's determination that Mr. Klein had "poor"[3] ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; maintain attention/concentration; understand, remember, and carry out simple, detailed but not complex, and complex instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. R. at 872-73. The record is replete with mentions of Mr. Kleins' ADHD and bipolar diagnoses. See e.g., R. at 70, 77, 82, 84, 399, 405, 434, 466. Mr. Consentino concluded that, "[d]ue to Christian's mental health disorders, he has difficulty in maintaining stable and consistency with work." R. at 872. The Court finds that this determination is consistent with the evaluations of Mr. Klein's mental health throughout the record. Furthermore, the Court cannot agree with the ALJ that Mr. Klein's ability "to take public transportation and go to the library in Yonkers" demonstrates that he has an

---

[3] The evaluation form defines "poor" as "No useful ability to function in this area." R. at 872.

ability to deal with the public. R. at 639.   Thus, the Court cannot agree with the ALJ that Mr. Consentino's opinion is completely "not persuasive." R. at 639.

However, the Court does agree with the ALJ's assessment that "Dr. Steven Tutnauer's medical assessment dated July 15, 2022, is not fully persuasive" because it was inconsistent with his own examinations. R. at 639. Dr. Tutnauer determined in his evaluation that Mr. Klein had a "fair"[4] ability to follow work rules; use judgment; function independently; understand, remember, and carry out simple or detailed but not complex instructions; maintain personal appearance; and demonstrate reliability and "poor"[5] ability to relate to co-workers; deal with the public; interact with supervisors; deal with work stresses; maintain attention/concentration; understand, remember, and carry out complex instructions. R. at 874-75. However, this conclusion was not supported by Dr. Tutnauer's own examination notes which state that Mr. Klein was "working as a mover" and could "study, and complete house chores." R. at 859, 661. While the doctor also noted that Mr. Klein was "struggling with work" and became "very irritable under stress," R. at 861, 875, the Court agrees with the ALJ that the inconsistencies between Dr. Tutnauer's notes and conclusions provide reason to find him "not fully persuasive." R. at 639.

---

[4] The evaluation form defines "fair" as "ability to function in this area is seriously limited, but not precluded." R. at 874.
[5] The evaluation form defines "poor" as "No useful ability to function in this area." R. at 874.

Finally, the Court does not agree with the persuasive weight that the ALJ afforded to Dr. Rozelman's opinion. First, Dr. Rozelman's opinion is somewhat inconsistent with the findings of other doctors. Dr. Rozelman asserted that Mr. Klein had no exertional (lifting, carrying, walking, standing, sitting, pushing, or pulling) or non-exertional (postural, manipulative, visual, communicative, or environmental) limitations. R. at 163.  However, Dr. Pelczar-Wissner determined that Mr. Klein had a "marked restriction for squatting, bending, and heavy lifting and carrying." R. at 469. Additionally, Dr. Antiaris determined Mr. Klein was "moderately limited in his ability to use reason and judgment to make work-related decisions," and "markedly limited in his ability to sustain concentration and perform a task." R. at 462. Dr. Antiaris also noted that her examination results seemed "consistent with psychiatric concerns which may significantly interfere with the claimant's ability to function on a daily basis." Id. The opinions of Dr. Pelczar-Wissner and Dr. Antiaris are persuasive because they are consistent with each other. Thus, the Court finds that Dr. Rozelman's conclusions were not consistent with the opinions of other doctors who evaluated Mr. Klein around the same time.

Moreover, Dr. Pelczar-Wissner and Dr. Antiaris were also consistent with Drs. Hussain and Tutnauer, as well as Mr. Consentino. Their opinions are well supported by medical findings and consistent with other substantial evidence that Mr. Klein is severely limited in his ability to relate with co-workers, supervisors, and the public, handle stress, and generally behave in an emotionally stable manner. The fact that

36

Dr. Rozelman stands alone as the sole doctor who did not reach similar conclusions about Mr. Klein's limitations is troublesome to this Court.

The Court is also mindful of the relationship between the various doctors and the plaintiff as authorized by 20 C.F.R. § 404.1520c (c)(3). Here, Dr. Rozelman did not have a doctor-patient relationship with Mr. Klein and only evaluated him once. Thus, the persuasive value of his opinion should be discounted as compared to Mr. Klein's treating physicians Drs. Hussain and Tutnauer.

Additionally, the Court also considers the sources that the various experts relied on. In making his assessment, Dr. Rozelman only relied on the medical records that were available to him in 2017. R. at 147. That same year, Dr. Antiaris similarly determined that Mr. Klein was not limited in his ability to understand, remember, and apply simple or complex directions and instructions. R. at 462. When Drs. Tutnauer and Mr. Consentino evaluated Mr. Klein five years later in 2022, both doctors found that Mr. Klein had a fair or poor ability to maintain concentration and to carry out simple instructions R. at 872, 874-875. The record shows a clear pattern that Mr. Klein's ability to do certain work-related tasks declined over the years, and Dr. Rozelman's 2017 assessment could not and did not reflect this reality.

In conclusion, the Court does not agree with the persuasive weight the ALJ afforded to the opinions of Dr. Hussain and mental health counselor Consentino. Moreover, the ALJ should have more fulsomely considered the 2022 evaluations.

Therefore, the Court finds that the ALJ erroneously relied on Dr. Rozelman as the only fully persuasive opinion when examining the opinion evidence.

**B. Whether the ALJ Misstated or Ignored Key Portions of Medical Evidence**

Mr. Klein's position is that the ALJ mischaracterized or ignored key aspects of the medical evidence. Pl. Memo. at 25. He further contends that the ALJ never acknowledges several "serious medical references" discussing his medical conditions, including an examination by Dr. Alejandro Leali's that diagnosed Mr. Klein with right hip impingement syndrome and a tear of the right acetabular labrum; an MRI of the right hip showing progressive anterior right hip pain with impingement; and an MRI of Mr. Klein's right wrist showing a tear of the volar fibers of the scapholunate ligament. Pl. Memo. at 26. Mr. Klein also argues that the ALJ "blatantly made erroneous medical statements" in her decision by misstating the medical notes she based her decision on. Pl. Memo. at 26-27.

In response, Defendant's position is that the ALJ appropriately considered the entire record in reaching the RFC finding. Opp. at 17. Defendant argues that the Second Circuit acknowledged that the ALJ "does not have to state on the record every reason justifying a decision, nor is an ALJ required to discuss every piece of evidence submitted." Id. Lastly, Defendant attempts to refute the argument that the ALJ mischaracterized the treatment notes, asserting that Mr. Klein's only issue is merely how the ALJ weighed the evidence. Opp. 17-18.

Notably, the ALJ "does not have to state on the record every reason justifying a decision," nor is an ALJ "required to discuss every piece of evidence

38

submitted." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013). However, this does not mean the ALJ can "ignore an entire line of evidence that is contrary to the ruling." Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003). Otherwise, it is "impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." Id. For it is a "fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination." Nix v. Astrue, No. 07-CV-344, 2009 WL 3429616, at *6 (W.D.N.Y. Oct. 22, 2009).

Here, the ALJ did not ignore medical evidence from Dr. Alejandro Leali's that diagnosed Mr. Klein with right hip impingement syndrome and a tear of the right acetabular labrum, an MRI of the right hip showing "progressive anterior right hip pain with impingement," and an MRI of Mr. Klein's right wrist showing a tear of the "volar fibers of the scapholunate ligament." R. at 919-20, 953-54, 1007-08. This evidence was reflected in the ALJ's decision when she acknowledged that Mr. Klein had suffered from the following severe impairments: "right hip impingement syndrome," and "a history of right wrist injury." R. at 629. The ALJ was not required to explicitly mention Dr. Leali's diagnosis, and it is evident from her determinations of Mr. Klein's medical impairments that she considered the diagnosis from Dr. Leali.

However, the ALJ did ignore or mischaracterize entire lines of the progress notes from the Hospital for Special Surgery. See R. at 639. The ALJ relies upon only aspects of the notes that support her determination while leaving unaddressed other

aspects of the notes. While referring to the progress notes, the ALJ stated, "a progress note on April 14, 2022, advised that the claimant "works as a mover" and "has no difficulties with ADLs [Activities of Daily Living]." R. at 639. However, that sentence goes on to add "but this is becoming more of an issue lately and he will have to have this treated." R. at 1022. The ALJ omits this aspect of the progress notes. The progress note also states that Mr. Klein's past work as a mover "aggravates" his "hip symptoms," which the ALJ also ignores. Id. By omitting these key phrases, the ALJ makes the progress note sounds like Mr. Klein's hip symptoms are not severe and the urgency is minimized. R. at 639. In its original form however, the progress note raises alarm bells around Mr. Klein's ability to perform activities of daily activities and emphasizes the need for treatment of his hip symptoms. R. at 1022. Thus, the Court finds that the ALJ committed legal error by ignoring or mischaracterizing this evidence.

## C. Whether the ALJ's Sit/Stand Option in the RFC is Erroneous

Mr. Klein argues the ALJ's RFC determination was erroneous and remand is warranted. Pl. Memo. at 28. Citing Ferraris v. Heckler, Mr. Klein contends that this sit/stand option, where he would have to frequently alternate between sitting and standing, is not within the meaning of sedentary work. Pl. Memo. at 27. The Second Circuit specifically noted in Ferraris that "alternating between sitting and standing may not be within the concept of sedentary work." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

40

In response, Defendant defends the ALJ's RFC determination, claiming that "substantial evidence supports the ALJ's RFC finding for a range of sedentary work." Opp. 18.

The Court agrees with Mr. Klein that alternating between sitting and standing may not be within the concept of sedentary work. "[S]edentary work requires that a person sit for most of an eight-hour workday…A sedentary worker thus needs to be able to sit for up to a total of six hours in an eight-hour workday." Hilton v. Kijakazi, 602 F. Supp. 3d 558, 571 (S.D.N.Y. 2022)(citing 20 C.F.R. § 404.1567(a); Ferraris v. Heckler, 728 F.2d at 587; SSR 83-10). "[I]n order to conclude that Plaintiff had the RFC to perform sedentary work, the ALJ needed to find that Plaintiff could remain seated for extended periods of time." Vellone on behalf of Vellone v. Saul, No. 20-CV-261 (RA), 2021 WL 2801138, at *1 (S.D.N.Y. July 6, 2021)

The SSA provides further context:

"In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)… most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base."

<u>Titles II & Xvi: Capability to Do Other Work-Themedical-Vocational Rules As A Framework for Evaluating Exertional Limitations Within A Range of Work or Between Ranges of Work</u>, SSR 83-12 (S.S.A. 1983).

The Court finds that the ALJ's sit/stand option in the RFC was erroneous. As represented in the RFC, Mr. Klein may be able to sit for 20 minutes at a time, but at some point, he would then have to stand for 1-2 minutes. R. at 632. The RFC also noted that Mr. Klein was limited to "simple unskilled work." <u>Id</u>. Adopting the SSA's rationale, Mr. Klein's need to intermittently "sit or stand at will" (SSR 83-12) may render him incapable of performing the unskilled jobs recommended by the VE. R. at 641-42. There is no finding that Mr. Klein would be able adjust his need to vary sitting and standing, so he would not be able to perform sedentary work. Thus, the ALJ committed legal error in the RFC determination and remand is warranted.

The Second Circuit in <u>Ferraris</u> stated that on remand, "the ALJ should make specific findings of exactly what Ferraris can do, especially with reference to his ability to sit and for how long." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984). Similarly in <u>Vellone on behalf of Vellone v. Saul</u>, the Court found that remand was necessary to determine the plaintiff's ability to perform sedentary work where the "record [was] nearly devoid of evidence pertaining to Plaintiff's ability to remain seated for extended periods of time." <u>Vellone on behalf of Vellone v. Saul</u>, 2021 WL 2801138, at *3. Likewise, here, on remand, the ALJ should make specific findings with reference to Mr. Klein's ability to sit and for how long.

**D. Whether the ALJ Failed to Properly Assess Work Activities**

Mr. Klein contends that the ALJ did not properly evaluate his ability to perform work activities on a function-by-function basis before concluding he was able to perform sedentary work. Pl. Memo. at 28. He argues that this failure on the part of the ALJ constitutes clear error under SSR 96-8p which states that the RFC can be expressed in terms of exertional levels of work: "sedentary, light, medium, heavy, and very heavy" only after identifying the individual's functional limitations or restrictions and assessing his or her work-related abilities on a function-by-function basis. Id. As Mr. Klein rightfully noted, the functions in 20 C.F.R. 404.1545 and 416.945 include walking, lifting, carrying, reaching, handling, and manipulating objects with hands. Id. Mr. Klein claims that the ALJ did not evaluate any of these activities before making her conclusions. Id.

In response, Defendant argues that the ALJ was not obligated to make a function-by-function assessment. Opp. 18. Defendant recites the law: "[w]here an ALJ's analysis…regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, ... remand is not necessary merely because an explicit function-by-function analysis was not performed." Id. (citing Domm v. Colvin, 579 F. App'x 27, 29 (2d Cir. 2014)). Defendant contends that substantial evidence supports the ALJ's RFC finding for a range of sedentary work and Mr. Klein has failed to demonstrate "greater limitations." Opp. 18-19.

43

Here, the Court does not find that the ALJ's analysis to be supported by substantial evidence such that additional analysis would be unnecessary or superfluous. While the ALJ found that Mr. Klein had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) "except an allowance for a sit/stand option after 20 minutes having to stand up 1-2 min," R. at 629, 632, as the Court discussed <u>supra</u>, a large part of sedentary work is being able to sit for a prolonged period of time. <u>See</u> <u>Carroll v. Sec'y of Health & Hum. Servs.</u>, 705 F.2d 638, 643 (2d Cir. 1983).

During the hearing, Mr. Klein testified about his difficulty sitting for some time before needing to change positions due to pain in his hip. R. at 664-65. This claim is substantiated by the record—from diagnoses such as "internal derangement, right hip" by Dr. Pelczar-Wissner in 2017, "cervical radiculopathy" by Dr. Mitelman in 2018, "right hip pain femoral acetabular impingement," pain and limited range of motion in the right hip by Dr. Gott in 2020, and "a positive Stinchfield with pain in the groin and palpatory tenderness over the rectus" by Dr. Leali, "progressive anterior right hip pain" with "impingement" in 2022. R. at 469, 526, 817, 919, 953.

The ALJ seemingly relied on the vocational expert's testimony as her substantial evidence. R. at 674-77. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion.'" <u>McIntyre v. Colvin</u>, 758 F.3d 146, 151 (2d Cir. 2014) (quoting <u>Dumas v. Schweiker</u>,

712 F.2d 1545, 1553–54 (2d Cir.1983)). However here, there is no substantial evidence in the record to support the assumption made by the ALJ that Mr. Klein can alternate between sitting and standing as frequently as she requires him to. As conveyed to the VE by the ALJ, the hypothetical was: "a sit-stand option after 20 minutes, having to sit down for one to two minutes and then stand back up, not being off-task." R. at 675. However, the evidence in the record does not demonstrate that Mr. Klein can sit for as long as the ALJ hypothesizes. Thus, the hypothetical does not accurately reflect Mr. Klein's limitations and capabilities.

Also, as noted supra, the RFC finding for sedentary work with the sit/stand option after 20 minutes does not fall within "the idea of sedentary work". See Ferraris v. Heckler, 728 F.2d at 587; 20 C.F.R. § 404.1567(a) (1982); Carroll v. Sec'y of Health & Hum. Servs., 705 F.2d 638, 643 (2d Cir. 1983). Thus, if the ALJ found this limitation to be an accurate reflection of Mr. Klein's capabilities, then the ALJ implicitly held that there was not substantial evidence to support a finding of "sedentary work" as defined by the statute. As a result, the VE's evaluation of possible jobs was flawed since he was not offered a hypothetical with substantial evidence to support the assumptions within the hypothetical and that accurately reflect Mr. Klein's limitations and capabilities.

In conclusion, remand is necessary here because an explicit function-by-function analysis was not performed even though the ALJ's analysis was not

supported by substantial evidence such that additional analysis would be unnecessary or superfluous. See Domm v. Colvin, 579 F. App'x at 29.

## IV. CONCLUSION

This Court finds that the ALJ made a faulty RFC determination by erroneously evaluating the opinion evidence, misstating or ignoring key aspects of the evidence, including an erroneous sit/stand option in the RFC, and failing to properly assess work activities. Therefore, remand is required.

For the foregoing reasons, Plaintiff's Motion (Dkt. No. 16) is **GRANTED**.

SO ORDERED.

DATED:      New York, New York
            March 22, 2024

                                    _Jennifer E. Willis_
                                    JENNIFER E. WILLIS
                                    United States Magistrate Judge

46